IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 10-00073-05-CR-W-NKL |
| PHOENIX INTERNATIONAL TELEPORT | ) | |
| SATELLITE SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
TO ACCEPT DEFENDANT'S GUILTY PLEA**

On June 30, 2011, I held a change-of-plea hearing after this case was referred to me by United States District Judge Nanette Laughrey. I find that Defendant's plea was voluntary and therefore recommend that it be accepted.

### I. BACKGROUND

On March 9, 2010, Defendant was indicted with one count of conducting an illegal gambling business, in violation of 18 U.S.C. §§ 1955 and 2. A change-of-plea hearing was held on June 30, 2011. The defendant's representative, Scott Peterson, was present, with retained counsel Gerald Handley. The government was represented by Assistant United States Attorney Jess Michaelsen. The proceedings were recorded and a transcript of the hearing was filed on July 20, 2011 (Doc. No. 135).

### II. AUTHORITY OF THE COURT

The authority of federal magistrate judges to conduct proceedings is created and defined by the Magistrates Act, 28 U.S.C. § 636. Besides certain enumerated duties, the Act provides that a "magistrate may be assigned such additional duties as are not inconsistent with the Constitution and

the laws of the United States." 28 U.S.C. § 636(b)(3).

The Eighth Circuit, following the reasoning of several other circuits, has held that magistrate judges may preside over allocutions and pleas in felony cases, so long as certain procedural safeguards are met. United States v. Torres, 258 F.3d 791, 795-96 (8th Cir. 2001); see also United States v. Dees, 125 F.3d 261 (5th Cir. 1997), United States v. Williams, 23 F.3d 629 (2d Cir. 1994). The reasoning applied by the appellate courts relies upon previous opinions by the United States Supreme Court that conducting jury *voir dire* falls within a magistrate judge's "additional duties" when the defendant has consented. See Torres, 258 F.3d at 795 (citing Peretz v. United States, 501 U.S. 923 (1991); Gomez v. United States, 490 U.S. 858 (1989)).

In Peretz, the Supreme Court held that when a defendant consents to a magistrate judge's involvement in *voir dire*, he waives any objection based on his right to have an Article III judge hear his felony case. 501 U.S. at 936. Moreover, the availability of *de novo* review by a district judge preserves the structural guarantees of Article III. Torres, 258 F.3d at 795. Applying the Peretz holding and adopting the reasoning of Williams, the Eighth Circuit held that the acceptance of guilty pleas bears adequate relationship to duties already assigned by the Magistrates Act in that "[a]n allocution is an ordinary garden variety type of ministerial function that magistrate judges commonly perform on a regular basis." Id. (quoting Williams, 23 F.3d at 633). Plea allocutions are substantially similar to evidentiary proceedings explicitly assigned by the Act. Id. at 796 (citing Dees, 125 F.3d at 265). Even if taking a guilty plea were considered to be of greater importance than those duties already assigned, the consent of the defendant saves the delegation. Id. "Consent is the key." Id. (quoting Williams, 23 F.3d at 633).

The Torres court also addressed the implications of such a delegation for Article III's case

and controversy clause. Id. Because plea proceedings are submitted to the district court for approval, the court retains ultimate control over the proceedings and is not bound to accept a plea taken by a magistrate judge. Id. Moreover, the district court's *de novo* review of the plea proceedings contributes to the ministerial nature of the magistrate judge's role. Id.

Based on the above, I find that, with the consent of the defendant, the District Court may properly refer a felony case to a Magistrate Judge for conducting a change-of-plea hearing and issuing a report and recommendation on whether the plea should be accepted.

### III. FINDINGS OF FACT

1. The parties consented to the delegation of the change of plea to the magistrate judge (Doc. No. 135 at 3).

2. On March 9, 2010, an indictment was returned charging Defendant with one count of conducting an illegal gambling business, in violation of 18 U.S.C. §§ 1955 and 2 (Doc. No. 135 at 4-6). Mr. Peterson indicated that he understood the nature of the charge (Doc. No. 135 at 4, 6).

3. The statutory penalty for this charge is a fine of up to $500,000, a $100 mandatory special assessment fee, and the potential for restitution to the alleged victims (Doc. No. 135 at 6). Mr. Peterson was informed of the penalty range and indicated that he understood (Doc. No. 135 at 6).

4. Mr. Peterson was advised of the following:

    a. That Defendant has a right to a trial by jury of at least 12 individuals and that their verdict must be unanimous (Doc. No. 135 at 7);

    b. That Defendant has the right to assistance of counsel throughout the trial (Doc. No. 135 at 7);

c. That Defendant is presumed innocent, and the government has the burden of coming forward to prove Defendant's guilt beyond a reasonable doubt (Doc. No. 135 at 7);

d. That Defendant's attorney would have the opportunity to cross-examine the government's witnesses (Doc. No. 135 at 7-8);

e. That Defendant has the right to testify but does not have to, and that the jury could not make an adverse inference from the fact that Defendant may not testify at trial (Doc. No. 135 at 8);

f. That Defendant has the right to subpoena witnesses to testify on its behalf (Doc. No. 135 at 8); and

g. That Defendant has the right to appeal any conviction to the Eighth Circuit Court of Appeals (Doc. No. 135 at 8-9).

5. Mr. Peterson was informed and understood that by Defendant pleading guilty, it was giving up all of the rights described above (Doc. No. 135 at 9).

6. Mr. Peterson was informed that during the change-of-plea proceeding, he would be placed under oath and questioned by counsel and the judge (Doc. No. 135 at 9).

7. Government counsel stated that if this case were to be tried, the government's evidence would be that between March 1, 2006 and March 31, 2009, Defendant conducted an illegal sports bookmaking business that was operated in the Kansas City, Missouri, metropolitan area and elsewhere (Doc. No. 135 at 10; Doc. No. 131, ¶ 3).

Defendant was an corporation organized in Arizona (Doc. No. 135 at 10; Doc. No. 131, ¶ 3). It was founded by Erik Wilson in order to provide 1-800 telephone service and later internet service

to offshore sports books primarily located in Costa Rica (Doc. No. 135 at 10; Doc. No. 131, ¶ 3). Defendant provided the offshore sports books with 1-800 dial tone that provided access to customers located in the United States (Doc. No. 135 at 10; Doc. No. 131, ¶ 3). Defendant provided this service knowing that the offshore sports books would provide illegal gambling services on a price per head basis to bookmakers located in the United States (Doc. No. 135 at 10; Doc. No. 131, ¶ 3).

Prior to March 2006, Erik Wilson sold Defendant and he retained the right to receive all profits until June 2010 (Doc. No. 135 at 10; Doc. No. 131, ¶ 3). From 2007 to the present, Scott Peterson was the Vice President and Treasurer of Defendant and also a 45% owner of Defendant (Doc. No. 135 at 10; Doc. No. 131, ¶ 3). From March 31, 2006 to March 12, 2009, Erik Wilson received $2,867,857.57 in profits from Defendant (Doc. No. 135 at 10; Doc. No. 131, ¶ 3).

The bookmakers in this sports bookmaking business provided their bettors with the 1-800 toll-free number, 1-800-335-9003 ("bettor number"), as well as the website best24b.com (Doc. No. 135 at 10; Doc. No. 131, ¶ 3). The bookmakers also provided their bettors with an account number and a password to use in order to place wagers on sporting events; they could call the "bettor number" or access the website to place wagers (Doc. No. 135 at 10; Doc. No. 131, ¶ 3). The bettors could also use their account number to access their wagering history or obtain other account information (Doc. No. 135 at 10; Doc. No. 131, ¶ 3).

The bookmakers used a separate 1-800 number, 1-800-330-5667 ("bookmaker number"), as well as the website best24b.com to track their bettors' activities and account balances (Doc. No. 135 at 10; Doc. No. 131, ¶ 3). The bookmakers had their own user name and password that they used in order to access their bettor's information and make changes to the bettor's accounts, if necessary (Doc. No. 135 at 10; Doc. No. 131, ¶ 3).

Both toll free 1-800 numbers were provided by Defendant in Arizona to Elite Sports located in Costa Rica (Doc. No. 135 at 10; Doc. No. 131, ¶ 3). Elite Sports acted as a virtual wire room for the illegal sports bookmaking operation, taking wagers from the bettors and keeping electronic records of the bettors' activities (Doc. No. 135 at 10; Doc. No. 131, ¶ 3). Results were located on Elite Sports' computer servers in Costa Rica (Doc. No. 135 at 10; Doc. No. 131, ¶ 3). Elite Sports did not have in interest in the outcome of the wagers, but instead charged the illegal sports bookmaking business a price per head for managing each bettor's account (Doc. No. 135 at 10; Doc. No. 131, ¶ 3). Gerlarmo Cammisano was responsible for collecting this fee from the bookmakers and forwarding it to Elite Sports (Doc. No. 135 at 10; Doc. No. 131, ¶ 3). Elite Sports then pain Defendant a fee for providing each 1-800 telephone number (Doc. No. 135 at 10; Doc. No. 131, ¶ 3). To collect the fee, Defendant utilized a third-party billing and collections company, Ingenieria later named Quality Tel, which was located in Venezuela (Doc. No. 135 at 10; Doc. No. 131, ¶ 3).

The bookmakers located in the Kansas City, Missouri metropolitan area would pay out or collect cash in person from their bettors usually on a weekly basis, paying the collections up to the organizer/manager or the sports bookmaking business (Doc. No. 135 at 10; Doc. No. 131, ¶ 3). The bettors wagered over $3,584,895.79 during the course of this illegal sports bookmaking business (Doc. No. 135 at 10; Doc. No. 131, ¶ 3).

8. Defense counsel stated that he had reviewed the government's file and felt comfortable recommending Defendant plead guilty (Doc. No. 135 at 9-10).

9. Mr. Peterson was placed under oath (Doc. No. 135 at 2). He stated he believed the Government had the above-described evidence (Doc. No. 135 at 10). Specifically, Mr. Peterson stated that between March 1, 2006 and April 1, 2009, Defendant was operating both within the

Western District of Missouri and elsewhere (Doc. No. 135 at 10-11). During this time, Defendant – in association with the individuals identified in the Indictment – knowingly conducted, financed, managed, supervised, directed or owned all or part of an illegal gambling business that involved sports bookmaking (Doc. No. 135 at 11). Doing so was in violation of Missouri law (Doc. No. 135 at 11). The business involved five or more persons and was in operation for more than 30 days (Doc. No. 135 at 11). The gross revenue for one day during this period exceeded $2,000 (Doc. No. 135 at 11-12). Defendant's activities were done knowingly and intentionally (Doc. No. 135 at 12). Mr. Peterson stated he believed Defendant was guilty of the crime for which it had been charged (Doc. No. 135 at 12).

10. Mr. Peterson had reviewed the plea agreement with his attorney and stated he understood the terms of the agreement (Doc. No. 135 at 12).

11. All promises made by the government were contained within the plea agreement (Doc. No. 135 at 12). No one had made any threats or any other promises in order to get Defendant to plead guilty (Doc. No. 135 at 12-13).

12. Defendant was satisfied with Mr. Handley's performance (Doc. No. 135 at 13). There is nothing Mr. Peterson as corporate representative asked Mr. Handley to do that Mr. Handley did not do (Doc. No. 135 at 13). Likewise, there is nothing Mr. Handley has done that Mr. Peterson did not want him to do (Doc. No. 135 at 13).

13. Defendant tendered a plea of guilty to Count One of the Indictment (Doc. No. 135 at 13-14).

## V. ELEMENTS OF THE CHARGED OFFENSE

The elements necessary to sustain a conviction for conducting an illegal gambling business

include: (1) the gambling business violates the law of the state in which it is conducted; (2) the gambling business involves five or more persons who conduct, manage, supervise, or direct such business; and (3) the gambling business has been in operation for more than thirty days or has a gross revenue that exceeds two thousand dollars in any one day. U.S. v. Sutera, 933 F.2d 641, 645 (8th Cir. 1991).

## V. ENFORCEMENT OF AGREEMENT IN ITS ENTIRETY

Out of an abundance of caution, it is important to note that the Plea Agreement contains provisions that may not be enforceable in this criminal action. To be sure, the Plea Agreement is both a plea agreement and a non-prosecution agreement for Scott Peterson and Erik Wilson. The language of the agreement purports to bind Mr. Peterson and Mr. Wilson both as agents of the corporation and also in their individual capacities. A record on this issue was made on June 1, 2011 (Doc. No. 128) and the Government subsequently filed a memorandum setting forth its position (Doc. No. 130).

"Plea agreements are treated as contracts and contracts are not normally binding on third parties." United States v. Callahan, 149 Fed. Appx. 4, 6 (1st Cir. 2005). See also United States v. Jensen, 423 F.3d 851, 854 (8th Cir. 2005)("Plea agreements are contractual in nature and should be interpreted according to general contractual principals."). The Indictment in this case charges Gerlarmo Cammisano, James J. Moretina, James L. Dicapo, Michael J. Lombardo, Phoenix International Teleport Satellite Services, Inc., and Elite Sports (Doc. No. 1). Scott Peterson and Erik Wilson are not parties to the Indictment. The Plea Agreement expressly states in paragraph one that it "binds only the parties, the United States Attorney for the Western District of Missouri, and OCRS, and does not bind any other federal, state, or local prosecution authority." (emphasis added). Despite this language, the Plea Agreement contains provisions that purport to bind Mr. Peterson and Mr.

8

Wilson in their individual capacities (i.e., ¶¶ 6(g)-(k)).  Although the Plea Agreement is enforceable as to Defendant and Messrs. Peterson and Wilson as corporate representatives of Defendant, the provisions against Messrs. Peterson and Wilson in their individual capacities would not be enforceable as part of this criminal case.[1]

### VI.  CONCLUSION

Based on the above, I make the following conclusions:

1.  The district court may lawfully refer this case to a magistrate judge for issuance of a report and recommendation on whether Defendant's guilty plea should be accepted.

2.  Defendant consented to having its plea taken by a magistrate judge.

3.  Defendant knowingly and voluntarily pleaded guilty to conduct establishing every element of the crime charged in Count One of the Indictment.

Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order accepting Defendant's guilty plea and adjudging Defendant guilty of the offense charged.

                                                */s/Robert E. Larsen*
                                                ROBERT E. LARSEN
                                                United States Magistrate Judge

Kansas City, Missouri
July 29, 2011

---

[1] The Government agrees with this assessment.  (Doc. No. 128 at 18-19).  During the June 1, 2011 hearing, Mr. Michaelsen stated:
> As a breach of contract between those parties, this would not be the -- the litigation would not be before this Court in this captioned case, you're absolutely correct.  We would have to -- it might be in some later agreement if we were to bring charges and [they] violated the agreement, obviously it would be in whatever action that would be.  If it's in the ancillary forfeiture proceeding, it would be in whatever action that would be.  It wouldn't be before this Court in this case.

(Doc. No. 128, page 18, line 20 - page 19, line 2).